## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

HORACIO MUNOZ-SAUCEDO,

        Petitioner,

    v.

YOLANDA PITTMAN,

        Respondents.

Civil Action
No. 25-2258 (CPO)

**OPINION**

**O'HEARN, District Judge.**

This case arises from Immigration and Customs Enforcement's ("ICE") re-detention of Petitioner, Horacio Munoz-Saucedo, on March 28, 2025. (ECF No. 1 at ¶ 33). Petitioner was most recently detained at the El Paso Processing facility, in El Paso, Texas, and filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (ECF No. 1). On June 9, 2025, the Court granted the Petition and entered an Order directing Petitioner be released subject to appropriate conditions of supervised release.  (ECF No. 23). This written decision supplements the Court's ruling on the record on June 9, 2025.

## I.    BACKGROUND

Petitioner is a native and citizen of Mexico, where he was born and lived until he entered the United States without inspection in September of 2006 at the age of approximately eighteen. (ECF No. 1 at ¶ 27). He has lived in the United States since that time, residing primarily in New Jersey, where he built a life and married his husband in 2013, with whom he has an open relationship. (*Id*. at ¶ 28).

In 2020, Petitioner was convicted of attempted endangering the welfare of a child, arising from an encounter in which he attempted to meet an individual who claimed to be fourteen years old, but was in fact, an undercover law enforcement agent. (*Id*. at ¶ 29). Petitioner allegedly agreed

to meet this individual, "[n]ot believing that the person was underage." (*Id*.). The New Jersey Superior Court sentenced Petitioner to a three-year term of imprisonment. (*Id*.). Upon his release in August of 2022, the Department of Homeland Security ("DHS") initiated removal proceedings based upon his unlawful entry and alleged commission of a crime involving moral turpitude. (*Id*. at ¶ 30).

During the removal proceedings, an immigration judge found that Petitioner was removable for entering the United States without inspection, but rejected the charge that his conviction constituted a crime involving moral turpitude. (*Id*.; ECF No. 1-6). On December 15, 2022, an immigration judge issued a final order of removal but granted Petitioner withholding of removal to Mexico based on his fear that "he will be harmed or even killed" due to his sexual orientation. (ECF No. 1 at ¶ 31; ECF No. 1-6). Thus, Petitioner cannot be deported to Mexico, the only country of which he is a citizen. (ECF No. 1 at ¶¶ 15–16, 39).

Following the removal order in 2023, Petitioner remained in custody for 90-days while ICE attempted, without success, to secure his removal to an alternate third country. (*Id*. at ¶ 32). Specifically, ICE attempted to remove Petitioner to Guatemala, the Dominican Republic, and Honduras. (ECF No. 20-1 at ¶ 8). Guatemala and the Dominican Republic declined to accept him, and Honduras never responded. (*Id*. at ¶¶ 9–11). As a result, after 90-days of detention, DHS released Petitioner under an order of supervision in March of 2023. (ECF No. 1 at ¶ 32).

After having been on supervised release without incident for over two years, ICE suddenly re-detained Petitioner on March 28, 2025, when he appeared for a regularly scheduled check-in at the Newark, New Jersey, field office. (*Id*. at ¶ 33). He was served with a notice of revocation of release and taken to the Elizabeth Detention Center, in Elizabeth, New Jersey. (*Id*.). Respondents alleged that revocation was warranted because Petitioner failed to provide written travel document

2

requests or acceptance letters from alternate countries to facilitate his removal. (*Id.*; ECF No. 1-8). Petitioner contends that the revocation was improper because ICE never provided specific instructions identifying which countries he was expected to contact, and thus he was denied a meaningful opportunity to comply. (ECF No. 1 at ¶¶ 51–52).

Counsel filed the instant Petition in this Court on April 2, 2025, because Petitioner had been taken to the Elizabeth Detention Center on March 28, 2025, and remained there while counsel prepared his Petition. (ECF No. 1 at ¶ 35; ECF No. 12 at 11). The Petition named the warden of the detention center, along with ICE Field Director John Tsoukaris and Secretary of Homeland Security, Kristi Noem, as Respondents. (ECF No. 1 at 1). At the time of filing, however, Petitioner was in transit to Texas. (ECF No. 15 at ¶¶ 12, 14). Specifically, the Petition was filed on April 2, 2025, at 5:40 p.m., (*see* ECF No. 1), but "at 3:00 p.m. on April 2, Petitioner left the Elizabeth Contract Detention Facility . . . and by 3:55 p.m. on April 2, he was on a flight to Texas." (ECF No. 15 at ¶¶ 12, 14 (cleaned up)). Upon arrival in Texas, Petitioner was "booked into custody at the Port Isabel Service Processing Center on April 3," (*id.* at ¶ 15), and thereafter, eventually transferred to "the El Paso Service Processing Center on April 4, 2025." (*Id.* at ¶ 17).

Petitioner remained in custody at the El Paso facility, (*id.* at ¶ 18), until on or about, June 5, 2025, when the Court added the Warden of the El Paso facility as a Respondent and issued a writ of habeas corpus ad subjiciendum commanding the warden to produce him for a hearing on June 9, 2025. (ECF No. 22). Prior to the hearing, the Court ordered supplemental briefing on "(1) whether Petitioner's removal is reasonably foreseeable and, if so, why and [to] provide a full and complete factual basis for such assertion; (2) what efforts, if any, the Government has taken to effectuate Petitioner's removal to a third country since December 15, 2022; and (3) the results or status of all such efforts."  (ECF No. 13 at 1).

3

As set forth in greater detail below, since his re-detention, ICE purportedly resumed efforts to remove Petitioner to a third country, but those efforts have admittedly been unsuccessful. (ECF No. 20-2 at ¶¶ 8–14; Hearing Tr. at 12:14–17). Indeed, at the hearing, ICE conceded that "Petitioner's removal is not, at present, imminent," and counsel for Respondents advised that he is not aware of any pending requests for any other country to accept Petitioner, or whether and when any such requests would be made. (Hearing Tr. at 12:18 to 13:2 (cleaned up)).

## II.    District of Confinement and Proper Custodian

Traditionally, for a court to entertain a habeas petition, a petitioner must file the petition in the district of his confinement and name his immediate custodian, typically the warden of the facility housing him. *E.g.*, *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004); *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 444 (3d Cir. 2021); *see also* 28 U.S.C. § 2242 ("Application for a writ of habeas corpus . . . shall allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known."). However, in cases where the petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." *Rumsfeld*, 542 U.S. at 450 n.18; *Ozturk v. Hyde*, 136 F.4th 382, 392 (2d Cir. 2025); *Demjanjuk v. Meese*, 784 F.2d 1114, 1115–16 (D.C. Cir. 1986). In such circumstances, "the naming of a more remote custodian—[such as] the Secretary of Homeland Security—satisfies the statutory requirements." *Ozturk*, 136 F.4th at 392 (citing *Demjanjuk*, 784 F.2d at 1116); *Khalil v. Joyce*, No. 25-01963, 2025 WL 972959, at *29–30 (D.N.J. Apr. 1, 2025).

Here, "to the best of counsel's knowledge, at the time of filing" on April 2, 2025, at 5:40 p.m., Petitioner was being detained at the Elizabeth Detention Center. (ECF No. 12, at 11). Indeed, shortly prior, at 4:22 p.m., ICE's detainee locator showed that Petitioner was detained at the

4

Elizabeth Detention Center. (ECF No. 1-10 at 1). But ICE now claims that "at 3:00 p.m. on April 2, Petitioner left the Elizabeth . . . Facility . . . and by 3:55 p.m. on April 2, he was on a flight to Texas." (ECF No. 15 at ¶¶ 12, 14 (cleaned up)). In Texas, Petitioner was "booked into custody at the Port Isabel Service Processing Center on April 3," (*id*. at ¶ 15), and eventually transferred to "the El Paso Service Processing Center on April 4, 2025." (*Id*. at ¶ 17). During that period, Petitioner "could not make any calls until he reached his" final destination, and his attorneys were unable to communicate with him. (ECF No. 4-4 at ¶ 17; ECF No. 12-1 (stating on the morning of April 3, 2025, that counsel had been "trying to reach [her] client with no success")).

According to supervisory detention and deportation officer Alexander Cabezas, on April 2, 2025, "prior to his transfer to Texas, Petitioner was served with a Notice of Transfer informing him that he would be transferred to the El Paso Service Processing Center." (ECF No. 15 at ¶ 10). Despite the fact that Officer Cabezas and counsel for Petitioner had been communicating via email regarding his detention and location since approximately March 31, 2025, Officer Cabezas did not provide that information to his counsel until the morning of April 3, 2025, after the Petition had already been filed. (ECF No. 12-1 at 2–7). Petitioner's counsel contacted Officer Cabezas via email stating, "I've been trying to reach my client with no success. It appears he was transferred out of [Elizabeth]. Could you please confirm? His location now appears at Port Isabel SC, but that facility just advised me that he is not there." (*Id*. at 4). Officer Cabezas responded, "[h]e was at Port Isabel in transfer status. He is en route to the El Paso [facility]. *I am not sure where El Paso will house him*." (*Id*. at 3 (emphasis added)). Counsel replied that Port Isabel officers advised her "that he is being transferred [back] 'to Elizabeth Contract Detention Center in Newark, NJ,' as of this morning." (*Id*. (cleaned up)). Yet later that afternoon, Officer Cabezas advised counsel that the

Port Isabel officers were "mistaken," and that Petitioner "is en route to El Paso, but *the actual detention facility is TBD*." (*Id*. at 2–3 (emphasis added)).

Thus, while Petitioner was in transit, ICE did not disclose to his counsel "where, or by whom, [he] was being detained and did not allow [him] to contact counsel or convey [his] whereabouts." *Ozturk*, 136 F.4th at 392 (noting that the Government "does not permit immigration detainees to communicate about their location while en route between detention facilities, because doing so would raise serious security concerns." (internal quotation marks omitted)).

Respondents do not, and cannot, dispute that "counsel did not know and could not find out who [Petitioner's] immediate custodian was when [his] petition was filed," *see id*., but Respondent nevertheless argues that the unknown custodian exception should not apply. (*See* ECF No. 9 at 22–24; Hearing Tr. at 7:12–13 (stating on behalf of Respondents, "I do not dispute the authenticity of the emails")). Respondents argue that because it notified *Petitioner* of his *ultimate* destination on April 2, "the identity of his custodian . . . [and eventual] district of his confinement [were] known the day of filing." (ECF No. 9 at 24; Hearing Tr. at 6:2 to 8:25). Respondents' position, the practical effect of which is "that for some unspecified period of time after detention—seemingly however long the government chooses to take in transporting a detainee between states or . . . facilities—a detainee would be unable to file a habeas petition at all, anywhere" is troubling and has been rejected. *Ozturk*, 136 F.4th at 392. "Such a rule finds no support in the law and is contrary to longstanding tradition." *Id*.; *Khalil*, 2025 WL 972959, at *37 ("Our tradition is that there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it.").

Further, notifying a petitioner of his ultimate destination is of little use if he is unable to communicate that information to his family, or to the attorneys preparing a petition, or otherwise

file his own petition. Following Respondents' logic, if Petitioner had filed his Petition on April 2, in the Western District of Texas, it would have run afoul of the immediate custodian and district of confinement rules because he was not yet confined in the Western District of Texas and did not arrive there until April 4, 2025. (ECF No. 15 at ¶¶ 15–17). Thus, for approximately two days, Petitioner, "would not have been able to call on any habeas court," not in New Jersey, Texas, or anywhere else. *See Khalil*, 2025 WL 972959, at *37; *see also Ozturk*, 136 F.4th at 393. This is precisely the type of circumstance that gave rise to the need for the unknown custodian exception. And courts have recognized that habeas jurisdiction cannot depend solely on a petitioner's knowledge of his location, particularly when the government controls his movements and may deliberately obscure his whereabouts or restrict his ability to communicate. *See Ozturk*, 136 F.4th at 392–93 (applying exception where the government did not disclose the petitioner's location to her attorneys or allow her "to contact counsel or convey her whereabouts to anyone"); *Demjanjuk*, 784 F.2d at 1115–16 (applying exception where the petitioner was in custody "in a confidential location," that was "unknown to his attorneys"). The exception ensures that habeas relief remains available even when a petitioner is confined at a secret location in a manner that prevents him from communicating with the outside world. Considering recent and ongoing events with respect to immigration detainees, the need for the exception clearly remains.

In sum, as Petitioner's attorneys received conflicting, inaccurate, and delayed information about his whereabouts, and because he was not permitted to communicate his location or ultimate destination during transit, his custodian was, for all practical purposes, unknown at the time of filing. This not only deprived Petitioner of meaningful access to counsel and the courts, but also rendered any attempt to seek habeas relief during transit impossible if the Court applied the district of confinement and immediate custodian rules. Therefore, the Court finds that the unknown

custodian exception is appropriate and that the Petition was properly filed in Petitioner's last known location, the District of New Jersey, against his more remote custodians, Director Tsoukaris and DHS Secretary Noem. *See Ozturk*, 136 F.4th at 392 (citing *Demjanjuk*, 784 F.2d at 1116).

## III.    DISCUSSION

Turning to the merits of the Petition, Petitioner argues, among other things,[1] that because no country has agreed to accept him and because ICE has not identified any alternative countries for removal, his continued detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001). (*See* ECF No. 1 at ¶¶ 36–43; ECF No. 12 at 19–23). Respondents contend that Petitioner's detention is lawful because it has not exceeded the presumptively reasonable six-month period, and ICE is still pursuing removal. (*See* ECF No. 9 at 32–35; ECF No. 20 at 6, 12–20).

Because Petitioner is an alien subject to a final order of removal, 8 U.S.C. § 1231 governs his detention. (ECF No. 1 at ¶ 37; ECF No. 9 at 16). After an order of removal becomes final, there is a 90-day removal period, during which the government "shall" remove the alien. 8 U.S.C.

---

[1] Because the Court released Petitioner based on his *Zadvydas* claim, the Court declines to address his claims regarding the allegedly improper revocation of his supervised release and commencement of removal proceedings. (*See* ECF No. 1 at ¶¶ 44–56). As such, the Court need not address Respondents' arguments that the Real ID Act strips this Court of jurisdiction from hearing those claims. (*See* ECF No. 9 at 26–28 (arguing that the Real ID Act eliminates jurisdiction over claims regarding "arrest or detention for the purpose of executing a final removal order")). There is no doubt that this Court has jurisdiction to consider Petitioner's *Zadvydas* claim, and Respondents do not assert otherwise. *E.g.*, *Jackson v. Att'y Gen. United States of Am.*, 663 F. App'x 245, 247–48 (3d Cir. 2016); *Alexander v. Att'y Gen. U.S.*, 495 F. App'x 274, 277–78 (3d Cir. 2012); *Koboi v. Lowe*, No. 24, 2024 WL 310211, at *2 (M.D. Pa. Jan. 26, 2024); *see also Linares v. Dep't of Homeland Sec.*, 529 F. App'x 983, 984–85 (11th Cir. 2013) ("Because Linares is not challenging his removal order [but his continued detention], the Real ID Act would not apply, and . . . the district court would have jurisdiction over the [*Zadvydas*] claim."); *Gul v. Rozos*, 163 F. App'x 317, 319 (5th Cir. 2006) ("To the extent that Gul's petition challenged his continued detention rather than the final order of removal, nothing in the Real ID Act precluded the district court from adjudicating the [*Zadvydas*] claim."); *see also* (ECF No. 9 at 35 n.9).

8

§ 1231(a)(1). During that "90–day removal period . . . aliens *must* be held in custody." *Zadvydas*, 533 U.S. at 683 (citing 8 U.S.C. § 1231(a)(2)) (emphasis added); *see also* 8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien."). After that 90-day period, "aliens ordered removed . . . [as] inadmissible under 8 U.S.C. § 1182," like Petitioner, (*see* ECF No. 1 at ¶ 30), "may be detained beyond the removal period" or "released" under supervision. 8 U.S.C. § 1231(a)(6); *Zadvydas*, 533 U.S. at 683. Thus, detention is mandatory for an initial 90-days, but thereafter is discretionary.

In *Zadvydas*, the Supreme Court considered whether § 1231(a)(6) "authorizes the [government] to detain a removable alien indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal." *Zadvydas*, 533 U.S. at 682, 688–89. The Court held that § 1231(a)(6) only authorizes detention for a period reasonably necessary to remove the alien, and "does not permit indefinite detention." *Nunes v. Decker*, 480 F. App'x 173, 174 (3d Cir. 2012); *see also Zadvydas*, 533 U.S. at 682 ("[W]e construe the statute to contain an implicit 'reasonable time' limitation . . . which is subject to federal-court review."). The Court explained that if the statute were construed to allow for indefinite detention, it would "raise a serious question" as to whether the Due Process Clause of the Fifth Amendment would "permit[] detention that is indefinite and potentially permanent." *Zadvydas*, 533 U.S. at 690–91, 96.

To help "guide lower court determinations," and to "limit the occasions when courts will need to make them," the Court held that six months of post-removal-order detention is "presumptively reasonable." *Id.* at 700–01; *Nunes*, 480 F. App'x at 174. But, if a detainee provides "good *reason* to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government must respond with *evidence* sufficient to rebut that showing. *Zadvydas*, 533 U.S. at 701 (emphasis added); *Nunes*, 480 F. App'x at 174. Additionally, as the

period of "postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely" concurrently shrinks. *Zadvydas*, 533 U.S. at 701.

### A. The Presumption of Reasonableness is Rebuttable

Although the Supreme Court established a six-month period of presumptively reasonable detention, it did not preclude a detainee from challenging the reasonableness of his detention before such time. *Zadvydas*, 533 U.S. at 699–701; *Ali v. Dep't of Homeland Sec.*, 451 F. Supp. 3d 703, 706–07 (S.D. Tex. 2020) ("This six-month presumption is not a bright line, . . . and *Zadvydas* did not automatically authorize all detention until it reaches constitutional limits."); *Hoang Trinh v. Homan*, 333 F. Supp. 3d 984, 994 (C.D. Cal. 2018) ("The six-month *Zadvydas* presumption is just that—a presumption . . . not a prohibition on claims challenging detention less than six months." (internal quotation marks omitted)); *Cesar v. Achim*, 542 F. Supp. 2d 897, 903 (E.D. Wisc. 2008) ("The *Zadvydas* Court did not say that the presumption is irrebuttable."); *see also* Ian Bratlie & Adriana Lafaille, *A 180-Day Free Pass? Zadvydas and Post-Order Detention Challenges Brought Before the Six-Month Mark*, 30 Geo. Immigr. L.J. 213, 239 (2016) ("[T]he Supreme Court did not hold that it would be impossible for detention to violate the statute or the Constitution until six months have expired.").

Nevertheless, Respondents argue that "any [*Zadvydas*] challenge . . . by an alien who has been detained for less than six months must be dismissed as premature." (ECF No. 9 at 32 (internal quotation marks omitted)). Respondents argue that *Zadvydas* created a bright-line rule that precludes Petitioner from challenging his 164-day detention, prior to the six-month mark. (*Id*.). Although some courts[2] have read *Zadvydas* as creating a bright-line rule—one that effectively

---

[2] (ECF No. 9 at 32 (citing *Luma v. Aviles*, No. 13-6292, 2014 WL 5503260, at *4 (D.N.J. Oct. 29, 2024); *Kevin A.M. v. Essex Cnty. Corr. Facility*, No. 21-11212, 2021 WL 4772130, at *2 (D.N.J. Oct. 21, 2021)); *Cesar*, 542 F. Supp. 2d at 902 (collecting cases).

allows the government to detain a person for at least six months without judicial review, even if there was no possibility of removal—a close reading of *Zadvydas* does not support that interpretation. *See Zadvydas*, 533 U.S. at 699–701; *Ali*, 451 F. Supp. 3d at 706–07; *Trinh*, 333 F. Supp. 3d at 994; *Cesar*, 542 F. Supp. 2d at 903; Bratlie & Lafaille, 30 Geo. Immigr. L.J. at 239. The focus of the Court's inquiry was on whether one's "particular circumstances amount[] to detention within, or beyond, a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 699. The Court directed lower courts to "measure reasonableness . . . in terms of the statute's basic purpose, . . . assuring the alien's presence at the moment of removal." *Id*. "[I]f removal is not reasonably foreseeable, the court should hold [that] continued detention unreasonable and no longer authorized by [the] statute." *Id*. at 699–701. The Court described the six-month mark as a "guide," not a rigid threshold. *Zadvydas*, 533 U.S. at 701; *Ali*, 451 F. Supp. 3d at 706–07; *Trinh*, 333 F. Supp. 3d at 994. The Court "did not say that the presumption is irrebuttable, and there is nothing inherent in the operation of the presumption . . . that requires it to be irrebuttable." *Cesar*, 542 F. Supp. 2d at 903; *see Zadvydas*, 533 U.S. at 699–701. Indeed, the Court expressly referred to the "similar" and *rebuttable* presumption in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991), where the Court created the presumption that a 48-hour delay in a probable cause hearing after an arrest was reasonable and constitutionally permissible. *See Zadvydas*, 533 U.S. at 701; *Riverside*, 500 U.S. at 56. There, the Court warned that it was not holding that a "probable cause [hearing] in a particular case passes constitutional muster simply because it [was] provided within 48 hours." *Riverside*, 500 U.S. at 56. Instead, a "hearing may nonetheless violate [the Fourth Amendment] if the arrested individual *can prove* that his or her probable cause determination was delayed unreasonably." *Id*. (emphasis added). For example, if a defendant can prove that it was a delay "for the purpose of gathering additional evidence to justify the arrest, a delay motivated by

ill will against the arrested individual, or delay for delay's sake." *Id*. After the presumptively reasonable 48 hours, "the arrested individual does not bear the burden of proving an unreasonable delay," and the burden shifts to the government to demonstrate the existence of extraordinary circumstances. *Id*. at 57.

Thus, the *Zadvydas* presumption, like the *Riverside* presumption, is rebuttable. *See Cesar*, 542 F. Supp. 2d at 904. The presumption of reasonableness is the default, but if a person "can prove" that his removal is not reasonably foreseeable, then he can overcome that presumption. *Cf. Riverside*, 500 U.S. at 56. In practical terms, before the six-month period elapses, the government bears no burden to justify detention, and the petitioner must claim and *prove*, that his removal is not reasonably foreseeable. *Cesar*, 542 F. Supp. 2d at 903–04 ("[T]he presumption scheme merely suggests that the burden the detainee must carry within the first six months . . . is a heavier one than after six months has elapsed."); *cf. Riverside*, 500 U.S. at 56.  But, after six months, the petitioner is entitled to release if he "provides good reason to believe" that removal is not reasonably foreseeable, and the government is unable to rebut that showing. *Zadvydas*, 533 U.S. at 701. "In other words, the government bears the burden of proof if the alien can offer any legitimate argument as to why there is no significant likelihood of removal." *Cesar*, 542 F. Supp. 2d at 903; *see also Zadvydas*, 533 U.S. at 701.

In short, the thrust of *Zadvydas* was to "interpret[] the statute to avoid a serious constitutional threat," the possibility of "indefinite, perhaps permanent detention." *Zadvydas*, 533 U.S. at 699. "[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by [the] statute." *Id*. The six-month presumption of reasonableness is merely a tool to "guide lower court[s]" in making those "determinations." *See id*. at 700–01. To hold otherwise would condone detention in cases where removal is not reasonably foreseeable or even

functionally impossible, so long as it did not exceed six months. *Cesar*, 542 F. Supp. 2d at 904; Bratlie & Lafaille, 30 Geo. Immigr. L.J. at 239 (holding "otherwise ignores *Zadvydas's* central command . . . to order release where removal is not reasonably foreseeable"). If indefinite detention, *i.e.*, detention where removal is not reasonably foreseeable violates the Constitution, the Supreme Court could not have intended to allow unconstitutional detentions, so long as they did not exceed six months. *Cesar*, 542 F. Supp. 2d at 904; Bratlie & Lafaille, 30 Geo. Immigr. L.J. at 239; *see Zadvydas*, 533 U.S. at 699–701.

Like *Riverside*, it is not difficult for this Court to envision scenarios in which detainees could prove that their removal is not reasonably foreseeable before the six-month mark. In some cases, detainees might be able to show that their detention is not driven by a legitimate interest in removal at all, but rather, detention for the sake of detention, motivated by animus towards a particular group, or "ill will against the . . . individual," or even a desire to inflict suffering. *Cf. Riverside*, 500 U.S. at 56. In other cases, like the present case, a detainee might be able to show that he is barred from returning to his country of origin and that no other country is willing to accept him. These are of course just a few possible scenarios. For all those reasons, the Court rejects Respondents' argument that *Zadvydas* precludes Petitioner from challenging his detention prior to the six-month mark.

### B. Petitioner's Removal is Not Reasonably Foreseeable

Here, Petitioner argues that his removal is not reasonably foreseeable because:

> 1) he cannot be deported to his home country due to his . . . [withholding of removal]; 2) ICE has historically managed to remove only a tiny fraction of non-citizens granted withholding or [Convention Against Torture relief] to alternative countries; 3) ICE has not been able to secure travel documents or even identify any alternate countries during [his] initial removal period; and 4) deporting [him] to . . . alternative countries would require additional, lengthy proceedings.

(ECF No. 1 at ¶ 41).

First, it is undisputed that Petitioner received "a withholding of removal under 8 U.S.C.§ 1231(b)(3)(A)," and cannot be deported to his country of origin, Mexico, due to the threat of persecution based on his sexual orientation. (*Id*. at ¶¶ 1, 8, 31; ECF No. 9 at 13). This substantially increases the difficulty of removing him.

Second, Petitioner cites *Johnson v. Guzman Chavez*, 594 U.S. 523, 537 (2021), where the Supreme Court discussed a study showing that in fiscal year 2017, "only 1.6% of aliens who were granted withholding of removal were actually removed to an alternative country." (ECF No. 1 at ¶ 18)[3]; *see Guzman Chavez*, 594 U.S. at 552 (Breyer, J., dissenting) ("Studies have . . . found that, once withholding-only relief is granted, the alien is ordinarily not sent to another . . . country. Rather, the alien typically remains in the United States for the foreseeable future."). Additionally, Petitioner provides deportation data from fiscal years 2020 through 2023, which appears to show that in those years, "ICE removed . . . only *five* non-citizens granted withholding or CAT relief to alternative countries." (*See* ECF No. 1 at ¶ 18 (emphasis in original); ECF No. 1-4 (displaying raw data)). Respondents seemingly recognize the low success rate and argue that "[w]hether ICE has historically removed aliens with withholding of removal . . . in the past does not mean that [Petitioner's] present detention is unreasonable or that ICE will not remove [him] to . . . [a] third country." (ECF No. 20 at 16). While the Court agrees that circumstances may evolve and that historical outcomes do not necessarily control the result in any particular case, the data nevertheless supports the general inference that removal for this particular class of detainees is

---

[3] The Petition mistakenly repeats paragraph numbers 18 and 19. (*See* ECF No. 1 at 6–7). On this occasion and in the next citation, the Court is referring to the second paragraph 18, under "Third Country Removal Procedures." (*See id*.).

substantially more difficult. *Cf. Guzman Chavez*, 594 U.S. at 537 ("[A]lternative-country removal is rare."). And the Court can consider this circumstance along with all the other relevant factors in determining the reasonableness of continued detention.

Third, it is undisputed that during his initial 90-day removal period, "ICE unsuccessfully attempted to find a third safe country before . . . releasing him on an order of supervision" and has not identified any potential countries during his supervised release or re-detention. (ECF No. 1 at ¶¶ 3, 14, 32, 39–40). Petitioner thus maintains that "there is no country to which he can be removed." (ECF No. 12 at 20). Finally, even if ICE identified a third country, Petitioner notes that he would be entitled "to seek fear-based relief from removal to that country," which would require "additional, lengthy proceedings." (ECF No. 1 at ¶¶ 40–41).

In summary, Petitioner has alleged that he cannot be removed to his country of origin, that removing similarly situated individuals has been historically rare, that ICE tried and failed to find a third country willing to accept him during the initial 90-day detention period, and that there is presently no country in the world willing to accept him. In their initial briefing, Respondents did not meaningfully contest these allegations. (ECF No. 9 at 32–35). Yet these allegations, left uncontested, would more than suffice to demonstrate that Petitioner's removal is not reasonably foreseeable, and therefore overcome the presumption that his detention is reasonable. As a result, the Court ordered supplemental briefing as to whether Petitioner's removal was reasonably foreseeable and directed Respondents to identify all removal efforts, and the status of those efforts. (ECF No. 13 at 1).

In supplemental briefing, Respondents provided additional details regarding its prior and ongoing attempts to remove Petitioner. During Petitioner's initial 90-day removal period, beginning in December of 2022, ICE attempted to remove Petitioner to Guatemala, the Dominican

Republic, and Honduras. (ECF No. 20-1 at ¶ 8). Guatemala and the Dominican Republic declined to accept him, and Honduras never responded. (*Id*. at ¶¶ 9–11). Having failed to find a third country willing to accept him, ICE released Petitioner under an order of supervision "on March 15, 2023," and, critically, has "not made further inquiry" to any country as to whether it would accept him until Petitioner's March 28, 2025, revocation of supervised release. (*Id*. at ¶ 12; ECF No. 20-2 at ¶¶ 6–7). Respondents offer no explanation for the lack of any efforts whatsoever to remove Petitioner during this two-year period of time.

Even after Petitioner's re-detention on March 28, 2025, it was not until May 12, 2025, nearly six weeks after his re-detention, that ICE initiated requests to Canada, Guatemala, and Honduras, to accept him. (ECF No. 20-2 at ¶ 12). Two years earlier, in 2023, Guatemala declined to accept Petitioner, and Honduras ignored ICE's request. (ECF No. 20-1 at ¶¶ 9–11). On May 16, 2025, Guatemalan officials responded that they had "not received instructions about accepting migrants from other nationalities." (*Id*. at ¶ 14). As of May 19, 2025, ICE had not received a response from Canada or Honduras. (*Id*. at ¶ 13).

At the Court's hearing on June 9, 2025, Respondents provided updated information, now advising that Canada, Guatemala, and Honduras had each "denied [ICE's] request" to accept Petitioner. (Hearing Tr. at 12:14–17). Further, ICE advised that "[P]etitioner's removal is not, at present, imminent," and counsel for Respondents advised that he "had not been told by ICE that any additional requests have been made" to any other countries. (*Id*. at 12:18 to 13:2).

In sum, considering the record as a whole as of the date of the hearing, Petitioner had shown that he cannot be removed to his country of origin, that ICE has had historically low success in removing similar individuals, that ICE made a total of six requests to other countries in 2023 and 2025 to no avail, that his "removal is not . . . imminent," and at present, there is no country willing

to accept him or currently considering a request to accept him. (Hearing Tr. 12:14 to 13:2). And, critically, ICE cannot provide any information as to whether and when additional requests would be directed and, if so, to which countries.[4] (Hearing Tr. at 12:14 to 13:19).

For all these reasons, the Court concludes that Petitioner has sufficiently established that his removal is not reasonably foreseeable and that his detention has exceeded the "period reasonably necessary to secure [his] removal." *See Zadvydas*, 533 U.S. at 699–700. As a result, he has successfully overcome the presumption that his 164-day detention remains reasonable. Accordingly, Petitioner's "continued detention [is] unreasonable and no longer authorized" under § 1231(a)(6). *See id*. at 699–700.

Finally, the Court must address Respondents' argument, improperly raised for the first time at the June 9, 2025, hearing, that continued detention is nevertheless warranted because Petitioner presents a danger to the community. (Hearing Tr. at 14:7–15). The Court acknowledges Petitioner's conviction and the circumstances thereof. But Respondents' last minute made argument lacks credibility considering that ICE voluntarily released Petitioner in 2023 after just 90-days of detention when it had no obligation to do so. (*Id*. at 14:16 to 15:14; ECF No. 1 at ¶ 32). If Respondents' arguments were made in good faith, presumably ICE would not have released Petitioner in 2023 or after his release would have taken action to re-detain him prior to March 28, 2025. (*See* Hearing Tr. at 14:7 to 15:14). Further, nothing supports the argument that danger to the community is a relevant factor to consider in conducting a *Zadvydas* analysis. *See Zadvydas*, 533

---

[4]    The Court easily rejects Respondents' argument that Petitioner is not entitled to relief because he has not "made good faith efforts to assist with securing travel documents necessary to effectuate his . . . removal." (ECF No. 9 at 35). Unlike the cases cited by Respondent, Petitioner does not hold the "key" to his freedom from detention—there is no allegation that he is refusing to provide information or documentation that would imminently effectuate his removal. (*See id*. at 34–36 (citing cases)).

U.S. at 690–92 (explaining that the Court has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections," but that these aliens have limited procedural protections and "bear[] the burden of proving . . . [they are] not dangerous, without . . . significant later judicial review"). Even assuming it was a relevant consideration, given ICE's decision to release him in 2023 and Petitioner's conduct during his two-years of supervised release there is no evidence to show an appreciable risk sufficient to overcome all of the other evidence refuting that continued detention is reasonable.[5]

## IV.    CONCLUSION

For the reasons stated herein, and for those stated on the record on June 9, 2025, the Petition is granted, and Petitioner shall be released under appropriate conditions of supervised release.


DATED: June 24, 2025

/s/ Christine P. O'Hearn
**Christine P. O'Hearn**
**United States District Judge**

---

[5]    Respondents submitted a proposed order of release that included location monitoring, presumably under the guise of the same argument. Yet Respondents never raised that issue in their briefing nor at the June 9, 2025 hearing. Further, such a request is inappropriate—because there is no authority provided for this Court to impose such conditions on a person subject to and under ICE supervised release—and unwarranted—because no such conditions existed for the two-years Petitioner was on supervised release prior to re-detention. As such, that condition was removed from the proposed order.